BOOMHOWER, Inc., Plaintiff,

v.

Louis L. LAVINE, trading as District
Dental Supply, Defendant.

Civ. A. No. 3648–55.

United States District Court
District of Columbia.

May 15, 1957.

Thaddeus G. Benton, New York City, Russell Hardy, Jr., Washington, D. C., for plaintiff.

David Hornstein, Washington, D. C., for defendant.

KEECH, District Judge.

This is an action for damages for breach of contract in connection with the assignment to the defendant, Louis L. Lavine, trading as the District Dental Supply, by the plaintiff, Boomhower, Inc., of the latter's lease from George J. Ohanides, deceased, of an office building at 1826 K Street, N. W. At the time of the assignment the property was owned by several heirs, who resided in Turkey.

Under the contract of assignment, it was provided that the plaintiff should receive, in addition to other consideration, the sum of $3,600, provided that this sum would not be payable unless there should be procured in defendant's favor on or before July 31, 1956, a valid lease covering the premises for a term of not less than three years from January 31, 1956, under all of the same terms and conditions of the existing lease, or a new lease for three years under the same terms and conditions except for a stipulated increase in rental. The contract of assignment further provided that the plaintiff should "forthwith" give notice of the assignment to the administrator of the estate of lessor and to two subtenants, and included the following paragraph:

"8. This contract embraces the entire agreement and understanding and representations of the parties; and may not be changed or modified except in writing signed by the parties; and shall be binding upon the parties hereto, their heirs, executors, administrators and assigns."

The form of agreement was originally drafted by Mr. Benton, president-attorney of the plaintiff. The defendant Lavine on August 8, 1952, submitted a counter-offer, adopting Mr. Benton's draft, but increasing plaintiff's time within which to accept from 48 to 72 hours, amending the sums to be paid plaintiff for the lease, and adding a new paragraph "7" (providing for the bonus to plaintiff upon extension of the lease) and "9" (providing for delivery to defendant of the duplicate original lease and sublease upon execution of the assignment contract). It is plaintiff's contention that on August 8, 1952, after Mr. Benton and defendant had left the office of defendant's attorney, Mr. Hornstein, and as they were going out of the building, Mr. Benton and defendant made an oral side agreement that the owners of the property and their agent would not be informed of the fact that defendant was willing to pay plaintiff a bonus if an extension of the lease were obtained.

Thereafter, on August 11, 1952, plaintiff accepted the contract of assignment as drafted by its president-attorney, with defendant's amendments, and still containing the provisions for forthwith notice by plaintiff to the owner of the assignment and paragraph "8" as quoted above.

The plaintiff did not notify the owners or their agent of the assignment of the lease. When the defendant attempted to pay the first month's rent, Mr. Grindley, attorney for the lessor's estate and agent for the heirs, the present owners, returned the check (via his attorney), inasmuch as defendant was a stranger to him. Thereafter, on September 8, 1952, pursuant to a telephone conversation between them, Mr. Hornstein, defendant's counsel, mailed to Mr. Riordan, the agent's attorney, a copy of the written assignment agreement, with a covering letter which called attention to the provision evidencing defendant's desire to obtain an extension of the lease. Thereupon the owners' agent accepted defendant as assignee of the lease.

At the time of the assignment of the lease to defendant, plaintiff had pending a suit against the lessor for an alleged breach of warranty of fitness of the premises as to the heating plant and plumbing, as well as in other respects (C.A. 4984–51). This fact was not made known to the defendant Lavine until some time after he had signed his firm offer of August 8, 1952. Although Mr. Lavine testified that, in a conversation between him and Mr. Benton as they went down in the elevator and walked out of the building, Mr. Benton mentioned for the first time that he had a law case pending against the owner of the property for certain services which had not been properly given to the plaintiff, the defendant frankly admitted that he was not clear as to the specific dates of certain other statements by Mr. Benton in his many telephone calls and conversations after execution of the assignment contract. "The" statement by Mr. Benton in his letter to Mr. Lavine of August 17, 1952 (after execution of the as-

signment contract by both parties), "I have a claim against the owner for his omission to supply what I regard as sufficient and proper heating apparatus," does not indicate that the information was being given for a second time. There is no conflict in the evidence that on September 10, 1952, Mr. Benton discussed with Mr. Lavine his pending suit against the landlord and, by letter of the same date, forwarded a copy of the complaint to the defendant.

On August 8, 1952, before the execution of the assignment, Mr. Grindley, at Mr. Benton's instance, sent to the owners in Turkey a cable dictated by Mr. Benton, asking that they cable authority to extend plaintiff's option to renew the lease for the additional three-year period, and stating that this would assure a good tenant over the whole period at a good rental, such extension to be conditioned on dismissal of plaintiff's suit against them. On August 14, 1952, Mr. Benton wrote directly to Mr. Petusis, who represented two of the heirs, repeating his offer to dismiss plaintiff's suit if the proposed extension were granted.

On November 13, 1952, in reply to a letter dated October 7 from Mr. Grindley, informing him of the assignment of the lease, Mr. Petusis stated that he relied on Mr. Grindley's opinion concerning the District Dental Supply, but made no mention of Mr. Grindley's cable of August 8 or Mr. Benton's letter of August 14 concerning extension of the lease. On March 19, 1953, Mr. Grindley again wrote Mr. Petusis and the third heir, Mrs. Pistikas, stating that it had been suggested at the pre-trial hearing of C. A. 4984–51 that plaintiff would dismiss the suit if the owners would grant a one-year extension of the lease from January 31, 1956, at a rental of $300 per month, and recommending the offer be accepted. On April 3, 1953, Mr. Grindley advised the heirs that the offer had been withdrawn and the case would be set down for trial. By letter dated May 3, 1953, Mr. Petusis declined to grant any extension of the lease to plaintiff, but offered to lease the premises directly to

the defendant at $325 a month, if plaintiff would withdraw the suit and reimburse the owners for all their expenses incident to its defense. He did not, however, state the duration of the proposed lease to defendant.

On January 29, 1954, Mr. Grindley wrote Mr. Petusis and Mrs. Pistikas that they had successfully defended plaintiff's suit in the lower court and that the case was pending in the Court of Appeals. He suggested, if it be their intention to sell the property, they had better try to do so promptly, in view of the falling real estate market. After some correspondence with reference to the condition of the property, offers to purchase, and defendant's exercise of a two-year option to renew contained in the existing lease, Mr. Grindley again wrote Mr. Petusis, on June 8, 1955, that the present tenant was an excellent one, who was anxious to secure an extension of from three to five years if the owners intended to keep the property or would be interested in purchasing it if the price were not exorbitant.

By letter of August 19, 1954, Mr. Grindley informed the heirs that plaintiff's breach of warranty suit against the lessor had been decided in their favor by the Court of Appeals. The correspondence concerning this suit discloses that the heirs were very much displeased with plaintiff for bringing the action, which they considered entirely unwarranted. It is also apparent from the correspondence that the heirs were desirous of selling the property if they could get a good price.

On July 21, 1955, Mr. Grindley submitted to Mr. Petusis and Mrs. Pistikas an offer by Mr. Benton, on behalf of plaintiff, to pay the owners a bonus of $1,000 if a three-year extension of the lease were granted on or before July 30, 1955. By letter dated July 31, 1955, Mr. Petusis rejected Mr. Benton's offer, stating the heirs whom he represented desired to sell the property at a minimum price of $50,000 net. By letter dated August 8, 1955, Mrs. Pistikas replied, stating she had not received the proposal

until August 6 and that she would approve a sale of the property for $60,000 net.

Some time after July 31, 1955, defendant made an offer to purchase the building for $35,000, the value at which it had been appraised. This was rejected, and the building was sold some time after defendant's lease had terminated, for the sum of $60,000 to a purchaser who had previously endeavored to purchase from the former owner for a sum far in excess of the appraised value and to whom the property had a peculiar value because of its location.

The defendant denies that he entered into any oral side agreement with the plaintiff's president-attorney, and contends the written assignment contract embodied all of their understanding, as stated therein. The record shows that the defendant, contrary to hindering the plaintiff in obtaining an extension of the lease, was very anxious to stay in the premises, to the extent of indicating to the agent his willingness to buy the building for a reasonable figure if the lease were not to be extended.

There is no evidence that the heirs in Turkey were at any time informed by anyone of the provision in the assignment contract for payment of a bonus to plaintiff should defendant be granted the three-year extension of the lease. Mr. Grindley, their local agent, denied that his recommendations concerning renewal of the lease were in any way affected by his knowledge of the bonus provision. Although his attorney, Mr. Riordan, admitted he told Mr. Benton that Mr. Grindley would not consent to any extension to plaintiff and, in substance, that Mr. Grindley would not enable Mr. Benton to receive the bonus, the correspondence between the agent and the owners corroborates Mr. Grindley's denial that he was affected by knowledge of the bonus provision.

It is the position of plaintiff that revelation of the bonus provision by Mr. Hornstein, defendant's attorney, to Mr. Grindley, agent for the owners, was in violation of the alleged oral side agree-

ment between plaintiff and defendant, that Mr. Grindley's knowledge that plaintiff would receive the bonus must have defeated or hindered any extension of the lease to defendant, hence plaintiff is entitled to the $3,600 which it would have received had defendant not made impossible the performance of the condition upon which the bonus was to be paid.

Plaintiff's president-attorney contends that the alleged oral side agreement is not within the parol evidence rule and is enforceable because it was an inducement to his entering into the written contract. He contends further that, even if it be found that there was no express oral side agreement, there was an implied condition of the written assignment contract that defendant should do nothing which would hinder plaintiff in its performance of the contract, specifically, that defendant should not disclose to the owners or their agent the provision for payment to plaintiff should the proposed extension of the lease be granted. He has argued that it was not necessary for defendant's attorney to send counsel for the owners' agent a copy of the entire assignment agreement, and that he, Benton, would have informed the agent of the assignment had he been requested by defendant to do so.

■■ The burden in this case is upon the plaintiff. There is a sharp conflict of testimony in many respects, most of which the court holds immaterial to a determination of the issues presented. In the light of all the material evidence in the case, the court concludes that plaintiff has not sustained its burden and is not entitled to recover.

First, plaintiff has not proved the existence of the alleged oral side agreement with defendant.

■ Second, as a matter of law, there could be no valid side agreement contrary to the express terms of the written contract, originally drafted by plaintiff's president-attorney and signed by him after the alleged oral agreement, still providing for forthwith notice to the owner by plaintiff and in terms stating that it embodied the whole agreement between the parties.

■■ It is elementary law that where parties enter into a written contract, their rights must be controlled thereby, and, in the absence of fraud or mistake, all evidence of any contemporaneous oral agreement on the same subject matter, contradicting, varying, modifying, or adding to the terms of the written agreement is inadmissible. Shankland v. Mayor, etc., 5 Pet. 390, 30 U.S. 390, 8 L.Ed. 166, affirming Shankland v. Corporation of Washington, Fed.Cas.No. 12,703, 3 Cranch C.C. 328; Selden v. Myers, 20 How. 506, 61 U.S. 506, 15 L.Ed. 976; Willard v. Tayloe, 8 Wall. 557, 75 U.S. 557, 19 L.Ed. 501. The written contract merges all previous negotiations and is presumed, in law, to express the final understanding of the parties. Brawley v. United States, 96 U.S. 168, 24 L.Ed. 622; Van Ness v. Mayor, etc., of City of Washington, 4 Pet. 232, 29 U.S. 232, 7 L.Ed. 842, affirming Van Ness v. United States, Fed.Cas. No. 16,868, 2 Cranch C.C. 376, 2 D.C. 376; Kinney v. McNabb, 44 App.D. C. 340.

■ The court recognizes that parol evidence of the understanding of the parties may be admitted to explain ambiguous language or to show an agreement as to some matter not included in the writing, for which it fails to provide, and that parol evidence also is admissible to prove a contemporaneous agreement in addition to and not inconsistent with or a variation of the written agreement between the same parties, which was an essential inducement of the written contract, or where the parties did not adopt the writing as a statement of their whole agreement. Brewood v. Cook, 92 U.S. App.D.C. 386, 207 F.2d 439.

■ The written contract here involved, however, is not ambiguous, does not omit provisions which must be supplied, and, in view of the express provision that it contains the entire understanding of the parties, does not come within the principles applied in the Brewood case, supra.

 The court further recognizes that every contract has an implied or constructive condition that neither party will hinder the other in the discharge of the obligations imposed upon him by the contract. Restatement of the Law of Contracts, § 315(1); Sunswick Corp. of Delaware v. United States, 109 Ct.Cl. 772, 75 F.Supp. 221, certiorari denied 334 U.S. 827, 68 S.Ct. 1337, 92 L.Ed. 1755. When the performance of one promise is an express or constructive condition of the duty to perform a return promise, there is obvious injury and a legal wrong if the promisor prevents the happening of the condition on which his duty to perform is made dependent. Williston on Contracts § 1293A.[1]

"An exception to this principle must be made where the hindrance is due to some action of the promisor which under the terms of the contract or the customs of business he was permitted to take * * *. Another obvious exception to the general rule is where the prevention or hindrance by one party is justified by the wrongful conduct of the other party, as where a material breach by one party induces the other to refuse subsequent performance of a promise or condition." There is a further qualification of the general rule, namely, "Acts that would have hindered or prevented performance are not a breach if the condition or return promise would not have been performed if those acts had not been done." Williston on Contracts § 1293A; Restatement of the Law of Contracts § 315 (2).

It is the view of the court that, assuming that disclosure of the bonus provision would necessarily defeat or hinder the obtaining of an extension of the existing lease or a new lease, a condition of secrecy on the part of defendant could not be implied as part of the written contract, inasmuch as the landlord, pursuant to business practices, had a right to proof of the assignment and knowledge of its terms.

Further, assuming there was an enforceable express oral agreement or implied condition of the written contract that defendant should not inform the owners of the full terms of the assignment contract, there was an initial breach of the written contract by plaintiff in failing promptly to notify the owners of the assignment of the lease. This entitled the defendant to take such steps as appeared necessary to protect his interests under the assignment, to the extent of furnishing the owner with a copy of the document under which defendant claimed possession of the premises.

Third, assuming again that there was such an oral side agreement, that it was enforceable, and that defendant breached it, there is no proof that this breach caused the owners to refuse to extend the lease. If it be conceded that a presumption of unfavorable effect would flow from proof of the lessors' knowledge of the bonus, the evidence in this case rebuts such presumption. As pointed out heretofore, the heirs were more interested in selling the property for a good price and wished to have no further dealings in which plaintiff was involved, because of their displeasure with its breach of warranty suit against them, pending for two of the three years during which plaintiff was attempting to secure the extension. It may well be that the heirs viewed plaintiff's offer to drop what they considered an entirely unfair suit against them, upon the condition that they extended the lease, as an attempt to obtain the extension by coercion. Further, the lease was not extended for defendant after July 31, 1955, the building being sold for a sum far in excess of the appraised value.

For the foregoing reasons, I find for the defendant on the plaintiff's claim.

1. So in the instant case defendant admits that if a purchase of the property by him prior to July 31, 1955, had made impossible the proposed extension of the lease beyond July 31, 1956, he would have been liable to plaintiff for the $3,600 bonus which plaintiff, because of defendant's purchase, would not have been able to earn.

The defendant has counterclaimed against the plaintiff for malicious prosecution. This counterclaim is based upon dismissal of a prior, substantially identical complaint (C.A. 424–55), plus the allegation that plaintiff brought the instant suit with full knowledge that it was baseless, particularly in view of an affidavit of Mr. Grindley, taken by defendant after dismissal of C.A. 424–55 and served on plaintiff prior to filing of this action. Mr. Grindley in his affidavit stated that he had recommended extension of the lease to Mr. Lavine but the owners had never consented to such an extension, and denied that the owners refused to extend or make a new lease because of any agreement on the part of defendant to pay any sum of money to plaintiff for that purpose.

Our Court of Appeals has laid down the rule with regard to the maintenance of actions for malicious prosecution: " * * * No action will lie for the recovery of damages sustained by the prosecution of a civil action with malice, and without probable cause, when there has been no arrest of the person or seizure of the property of the defendant, and no special injury sustained, which would not necessarily result in all suits prosecuted to recover for like causes of action." Peckham v. Union Finance Co., 60 App. D.C. 104, 105, 48 F.2d 1016, 1017. Applying this rule, the Court has held, "The burden of being compelled to defend successive unconscionable suits is not one which would 'necessarily result in all suits prosecuted to recover for like causes of action.'" Soffos v. Eaton, 80 U.S. App.D.C. 306, 307, 152 F.2d 682, 683.

It is true that the complaint dismissed in C.A. 424–55 was substantially identical with the complaint in the instant case. It was not, however, dismissed upon the merits, but on the ground that the action was premature, having been filed prior to July 31, 1955, the expiration of the period in which renewal of the lease would have entitled plaintiff to the bonus. Re-filing of the action after the cause of action had matured was therefore a result normally to be expected by the defendant. Although defendant's knowledge of the Grindley affidavit might be considered as bearing upon malice and want of probable cause, these elements are immaterial in view of the principle enunciated in the Peckham case, supra. Inasmuch as there was no arrest of person or seizure of property and the only elements of damage on which proof was adduced were the attorney's fee incurred by defendant and compensation for defendant's own loss of time from his business necessitated by defense of the suit, both elements of damage which would necessarily result from any litigation against defendant, it is the view of the court that, under the Peckham rule, plaintiff is entitled to judgment on defendant's counterclaim.

Counsel for the defendant will please prepare promptly appropriate findings of fact, conclusions of law, and order, submitting a copy to counsel for the plaintiff and to the court. Counsel for plaintiff will then prepare such objections and additions thereto as he may deem appropriate, and serve a copy thereof upon counsel for defendant, with a copy to the court. The court will, after receipt of plaintiff's suggestions, consider the proposals and, if need there be, respective counsel will be advised of the time for conference thereon.