**John M. LEE et al., Appellants,**

v.

**FLINTKOTE COMPANY.**

**No. 77-1355.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 1977.

Decided Jan. 11, 1979.

---

Coleman R. Rosenfield, Fort Lauderdale, Fla., of the bar of the Supreme Court of Florida, pro hac vice, by special leave of Court, which whom Michael D. Hausfeld, Washington, D. C., was on the brief, for appellants. Jerry S. Cohen, Washington, D. C., also entered an appearance for appellants.

Jay F. Gordon, New York City, with whom George Berger, New York City, was on the brief, for appellee.

Before BAZELON, LEVENTHAL and ROBINSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

This appeal emanates from a summary judgment rejecting a claim of intentional interference by a third party with contractual relations subsisting between franchisees of retail paneling stores and their franchisor.[1] The pivotal issue is whether the franchise contracts conferred upon the franchisees the exclusive right to sell the franchisor's products within the territories respectively franchised. A subsidiary question is whether the agreements were ambiguous on that score and thus opened the door to introduction of extrinsic evidence purporting to reflect the parties' intentions. We answer both questions in the negative and accordingly affirm.

## I. BACKGROUND

Appellants are owners and operators of individually-franchised retail outlets in the Washington-Baltimore area known as Ply*Gem paneling centers. They obtained their franchises between 1969 and 1974 through essentially similar contracts made with a unit of a corporate group which we shall refer to as Ply*Gem.[2] Appellants as-

sert that by the terms of the franchise agreements, Ply*Gem guaranteed each franchisee the exclusive right to sell Ply*Gem paneling and related products within two and one-half miles of the location of his paneling center.[3]

In March, 1976, by virtue of a contract with Ply*Gem, the Flintkote Company became the general distributor of Ply*Gem products.[4] Appellants claim that Flintkote thereby gained, and began exercising, authority to sell Ply*Gem products to other retail dealers in their exclusive areas. For this they sued Flintkote for damages, alleging that it entered into the agreement "with full knowledge of the contracts between [appellants] and PLY*GEM Companies, and with the intent to injure, destroy and otherwise interfere with the due prosecution of [appellants'] businesses. . . ."[5]

Finding no ambiguity in the franchise agreements—which contained an express merger clause[6]—the District Court rejected appellants' contention that by virtue of the contracts they acquired the sole right to sell Ply*Gem products within their stores' territories.[7] Rather, the court held, such exclusivity as was conferred was simply the right to be the only "Ply*Gem outlet within a two and one-half mile radius."[8] The court further held that extra-contractual evidence proffered by appellants in an effort

1. *Lee v. Flintkote Co.*, No. 76–1491 (D.D.C. Feb. 25, 1977) (unreported), Joint Appendix (J.App.) 108–113.

2. There are several interrelated Ply*Gem corporations. See *Lee v. Ply*Gem Indus., Inc.*, 193 U.S.App.D.C. ——, —— n. 1, 593 F.2d 1266, 1267 n. 1 (1979). The parties usually refer to them collectively as "the Ply*Gem companies." Since corporate distinctions are unimportant to the issues on this appeal, we adopt the shorter collective designation "Ply*Gem" in the interest of simplicity.

3. The provisions upon which appellants predicate this position are reproduced in text *infra* at note 47, and are discussed in Part IV *infra*.

4. J.App. 26–34. Flintkote maintains a marketing organization, and the Ply*Gem-Flintkote agreement contemplated that Flintkote would distribute Ply*Gem products in areas served by

Flintkote's supply centers. J.App. 26. The term of the contract was eighteen months, with automatic year-to-year renewal in the absence of notice of termination. J.App. 29. Previously, the area distributor for appellants was Ply*Gem of Laurel, Inc., one of the corporate group. Complaint Exhibit (Ex.) 1 at 1.

5. Complaint ¶ 7, J.App. 10.

6. "This agreement constitutes the entire understanding of the parties hereto, and no representations, inducements, promises or agreements, oral or otherwise, not embodied herein shall be of any force and effect." Complaint, Ex. 1 at 12, ¶ 16.

7. *Lee v. Flintkote Co.*, supra note 1, at 2–6, J.App. 109–113.

8. *Id.* at 3, J.App. 110.

to support their position was either irrelevant or barred by the parol evidence rule.[9] Since, in its view, appellants did not possess exclusive selling rights under their franchise agreements, the court concluded that Flintkote was not interfering with their business relations with Ply*Gem,[10] and it granted Flintkote's motion for summary judgment.[11]

Appellants assert that the franchise agreements, properly construed, endow them with the exclusive right to sell Ply*Gem products within their designated territories. Alternatively, they contend

that the contractual language was at least ambiguous, that the evidence they unsuccessfully sought to introduce was admissible to clarify its meaning, and consequently that the case was not in a posture permitting summary judgment.[12] We disagree with appellants on all counts.

## II. THE CHOICE OF LAW

■■■ This litigation is maintainable in the federal courts because the parties are of diverse citizenship.[13] With federal jurisdiction so based, we normally would first determine the applicable local law.[14] All of

9. Appellants submitted to the District Court several documents purportedly reflecting the parties' expectations as to the level of business the franchisees could expect from contractors. The District Court deemed this evidence irrelevant to the issue of exclusivity. *Id.* at 2, J.App. 111. Appellants also tendered the minutes of a Ply*Gem management meeting held in December 1968. Admission of these, the court held, was barred by the parol evidence rule. See Part III *infra*. In this court, appellants specifically question only the propriety of excluding the minutes. Brief for Appellants at 13–14.

10. *Lee v. Flintkote Co., supra* note 1, at 5, J.App. 112.

11. *Id.* at 6, J.App. 113.

12. Appellants also urge that their own motion for summary judgment should have been granted. This argument becomes meritless in light of our holding, see Part IV *infra*, that an essential element of their claim—the existence of a contract granting them exclusive selling rights—is lacking. See *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 288 (D.C.App.1977); *Hunter Vending Co. v. D. C. Vending Co.*, 345 A.2d 142, 143 (D.C. App.1975).

13. 28 U.S.C. § 1332 (1976).

14. We do not mean to imply that application of District of Columbia law is mandated by *Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In the first place, Congress, when enacting the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L.No.91–358, 84 Stat. 473 (1970), did not amend the Rules of Decision Act, 28 U.S.C. § 1652 (1976), to include the District of Columbia within its ambit. Had Congress wished the Rules of Decision Act to govern in situations such as the one before us, it could easily have revised the act after the fashion of 28 U.S.C. § 1332(d) (1976), which denominates the District of Columbia a "state" for purposes of

diversity jurisdiction. See *Palmore v. United States*, 411 U.S. 389, 395, 93 S.Ct. 1670, 1675, 36 L.Ed.2d 342, 350 (1973) ("[w]e are entitled to assume that in amending § 1257 [of Title 28], Congress legislated with care, and that had Congress intended to equate the District code and state statutes for the purposes of § 1257, it would have said so expressly, and not left the matter to mere implication"). Secondly, the constitutional considerations discussed in *Erie R. R. v. Tompkins, supra*, 304 U.S. at 78, 58 S.Ct. at 822, 82 L.Ed. at 1194 ("Congress has no power to declare substantive rules of common law applicable in a State whether they be local in their nature or 'general' . . .") have no force in this context, for the District, unlike the states, has no reserved power to be guaranteed by the Tenth Amendment. *Cf. Hepburn v. Ellzey*, 6 U.S. (2 Cranch) 445, 452–453, 2 L.Ed. 332, 335 (1805).

Nevertheless, we have in past diversity cases looked to the District of Columbia's courts to provide the applicable choice of law principles and substantive rules of decision. See *Semler v. Psychiatric Inst.*, 188 U.S.App.D.C. 41, 45–50, 575 F.2d 922, 926–931 (1978); *cf. Blair v. Prudential Ins. Co.*, 153 U.S.App.D.C. 281, 472 F.2d 1356 (1972). That seems proper because the Court Reform Act made the District of Columbia Court of Appeals the "highest court" of the District, and thus the principal arbiter of District law:

The highest court of the District of Columbia is the District of Columbia Court of Appeals. Final judgments and decrees of the District of Columbia Court of Appeals are reviewable by the Supreme Court of the United States in accordance with section 1257 of title 28, United States Code.

D.C.Code § 11–102 (1973). Indeed, were we not to yield a measure of deference to the District of Columbia Court of Appeals, two courts—neither of which could review the other's decisions—would engage independently in the process of formulating the local law of the District. That would subvert the dual aims of

the franchise agreements, however, expressly state that they are to be interpreted conformably to the law of New York.[15] Whether such a provision is operative in a federal court action founded on diversity depends upon the conflict of laws principles of the jurisdiction in which the court sits.[16]

At no time during the course of this litigation have the parties briefed the choice of law question.[17] Nor have they, either in the District Court or here, relied upon the law of New York or of any other jurisdiction in particular as the sole source of controlling precedent. The District Court apparently assumed that District of Columbia law governed the issues presented,[18] and with that the litigants seem perfectly content. Our initial concern is whether we ourselves should take a different tack.

We were confronted with this problem once before. The occasion was presented in 1961 when an appellant who at the trial level relied on District of Columbia caselaw complained on appeal that Ohio law should have been applied. After an extensive review of the authorities, we disagreed:

> [O]rderly administration of justice suggests that plaintiff should not at this late stage be allowed to rely on the law of another jurisdiction. While this court

---

*Erie*: discouraging forum shopping and promoting uniformity within any given jurisdiction on matters of local substantive law. *Erie R. R. v. Tompkins, supra*, 304 U.S. at 74–77, 58 S.Ct. at 820–822, 82 L.Ed. at 1192–1193. As we have heretofore observed, "it would be unfair for the character or result of a litigation materially to differ because the suit had been brought in a federal court." *Walko Corp. v. Burger Chef Sys., Inc.*, 180 U.S.App.D.C. 306, 312, 554 F.2d 1165, 1171 (1977), quoting *Hanna v. Plumer*, 380 U.S. 460, 467, 85 S.Ct. 1136, 1141, 14 L.Ed.2d 8, 14 (1975). See Williams, *District of Columbia Reorganization, 1970*, 59 Geo.L.J. 477, 494–495 (1971); Note, *An Erie Doctrine for the District of Columbia*, 62 Geo.L.J. 963 (1974).

**15.** "This agreement has been prepared and negotiated within the State of New York and shall not take effect until it has been approved and accepted by Licensor in the State of New York. The agreement shall be enforced, construed and interpreted in accordance with the laws of the State of New York. . . ." Complaint, Ex. 1 at 12, ¶ 17(a).

**16.** *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

An intriguing question we do not reach is whether the District of Columbia courts would invoke judge-made choice of law principles or, rather, the Uniform Commercial Code's conflicts of laws provision in passing on the effectiveness of the parties' stipulation as to the applicable law. D.C.Code § 28.1–105(1) (1973) reads:

> Except as provided hereafter in this section, when a transaction bears a reasonable relation to the District and also to a state or nation the parties may agree that the law either of the District or of such state or nation shall govern their rights and duties. Failing such agreement this subtitle applies to transactions bearing on appropriate relation to the District.

There appears to have been no occasion for consideration of the efficacy of a choice of law contractual provision in District of Columbia decisionmaking, which incorporates an interest-analysis approach in cases bereft of such a specification. See, *e. g., Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., Inc.*, 147 U.S. App.D.C. 14, 21–22, 452 F.2d 1346, 1353–1354 (1971); *Fowler v. A. & A. Co.*, 262 A.2d 344, 348 (D.C.App.1970); *McCrossin v. Hicks Chevrolet, Inc.*, 248 A.2d 917, 921 (D.C.App.1969); Milhollin, *The New Choice of Law in the District of Columbia*, 24 Cath.U.L.Rev. 448 (1975).

Determination of the applicability of § 28:1–105(1) here would involve a decision on whether the Uniform Commercial Code extends to franchise contracts. In general, Article 2 of the Code applies to "transactions in goods," not merely sales. D.C.Code, § 28:2–102 (1973). With scant discussion of this initial problem, some courts have applied the Code to franchise agreements. *E. g., Ashland Oil, Inc. v. Donahue*, W.Va., 223 S.E.2d 433 (1976), *noted*, 55 Tex.L.Rev. 541 (1977). Others have ignored the Code in franchise cases. *E. g., Bak-A-Lum Corp. of America v. Alcoa Bldg. Prods., Inc.*, 69 N.J. 123, 351 A.2d 349 (1976). For reasons subsequently expressed, see notes 17–19 *infra* and accompanying text, we decline to reach the intractable quasi-*Erie* problem of predicting how the District of Columbia courts would resolve this controversy.

**17.** Appellee recognizes the problem but informs us that the applicable legal principles are common to the law of all parties' home jurisdictions with the result that the conflict of laws question is academic. Brief for Appellee at 12–14 (unnumbered footnote).

**18.** The court relied on *Hunter v. D. C. Vending Co., supra* note 12. *Lee v. Flintkote Co., supra* note 1, at 4 n. 4, J.App. 111.

recognizes its power to take judicial notice of applicable state law, or to remand for its application, nothing in this record suggests that it is appropriate to do so in order to avoid injustice or to promote the ends of justice. We conclude, therefore, that the trial court was not bound to notice and apply the law of Ohio or Maryland statutory law when appellant not only failed to rely on either but affirmatively argued the law of the District.[19]

Four years later, the District of Columbia Court of Appeals endorsed this approach.[20]

These decisions, pronounced when both courts shaped the evolving common law of the District of Columbia,[21] chart the course we must pursue here. The rule they established, whether viewed as purely procedural in nature[22] or as the expression of a conflict of laws policy of the District,[23] dictates recourse to District law. We believe, moreover, that sound judicial administration and the potential unfairness of invoking a body of foreign law that neither side has considered applicable strongly support that approach here.[24] We turn, then, to identify the principles relevant to the issues before us.

## III. THE PAROL EVIDENCE RULE AND THE "PLAIN MEANING" RULE

The District of Columbia recognizes both the parol evidence rule[25] and its relative, the "plain meaning" canon of contract interpretation.[26] The District Court felt that consideration of minutes of a 1968 management meeting of Ply*Gem featuring promotional techniques—prior to execution of any of appellants' franchise agreements—was barred by the parol evidence rule. A segment of those minutes captioned, "In Answer to Questions Posed by Potential Franchisees," reads:

19. *Jannenga v. Nationwide Life Ins. Co.*, 109 U.S.App.D.C. 385, 388, 288 F.2d 169, 172 (1961).

20. *Young v. State Farm Mut. Auto. Ins. Co.*, 213 A.2d 890 (D.C.App.1965). See also *Montgomery Federal Savings & Loan Ass'n v. Baer*, 308 A.2d 768, 777 (D.C.App.1973).

21. Prior to the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L.No.91–358, 84 Stat. 473 (1970), this court administered the local as well as the federal law. As one commentator has noted, "[t]he Court Reorganization Act itself . . . is not designed to affect directly the existing body of legal precedent in the District of Columbia." Williams, *District of Columbia Court Reorganization, 1970*, 59 Geo.L.J. 483, 493 (1971).

22. See generally *Utility Control Corp. v. Prince William Constr. Co.*, 558 F.2d 716, 720 (4th Cir. 1977); *Fitzsimmons v. Best*, 528 F.2d 692, 694 (7th Cir. 1976).

23. See note 16 *supra* and accompanying text.

24. Professor Brainerd Currie searchingly analyzed this issue and thought the course we take today advisable. Currie, *On the Displacement of the Law of the Forum*, 58 Colum.L.Rev. 964 (1958).

25. *Boomhower, Inc. v. Lavine*, 151 F.Supp. 563, 567 (D.D.C.1955); *Tonn v. Philco Corp.*, 241 A.2d 442, 445 (D.C.App.1968); *Kinney v. McNabb*, 44 App.D.C. 340, 343 (1916). See also D.C.Code, § 28:2–202 (1973). " '[T]he pa-

rol evidence rule requires that "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." ' The consequences which the law attaches to a written contract are as much a part of it as the terms it sets forth, and the legal effect of the contract can no more be changed or modified by parol evidence than it could have had it been made express. The law ascribes to the contractual obligation of two or more a joint character unless the contract makes evident an intention that a several performance is to be indulged. That legal incident of the option in suit cannot be abrogated by recourse to evidence extrinsic to the contract." *Clayman v. Goodman Properties, Inc.*, 171 U.S.App.D.C. 88, 95, 518 F.2d 1026, 1033 (1973), quoting *Murray v. Lichtman*, 119 U.S.App.D.C. 250, 252, 339 F.2d 749, 751 (1964), in turn quoting 3 Corbin, Contracts § 573 (1960) (footnotes omitted).

26. *1901 Wyoming Ave. Coop. Assoc. v. Lee*, 345 A.2d 456, 461 (D.C.App.1975); *Burbridge v. Howard Univ.*, 305 A.2d 245, 247 (D.C.App. 1973); *Minmar Builders, Inc. v. Beltway Excavators, Inc.*, 246 A.2d 784, 786 (D.C.App.1968); see text *infra* at notes 32–33. See also *E. P. Hinkel & Co., Inc. v. Manhattan Co.*, 165 U.S. App.D.C. 140, 144, 506 F.2d 201, 205 (1974).

**Q. 26. WHY DO I NEED YOU? I CAN OPEN A PANELING STORE AND BUY THROUGH OTHER PANEL DISTRIBUTORS WITHOUT GIVING YOU $10,000.**

\* \* \* \* \* \*

In addition, you receive the exclusive rights within your area to the Ply\*Gem name and their products. . . .[27]

■ Insofar as these minutes may have been offered to show an antecedent compact or understanding varying or supplementing the terms of the franchise agreements, the District Court correctly rejected them. The franchise contracts state unequivocally that they embody the final and exclusive understanding of the parties,[28] and District law gives full effect to that stipulation.[29]

■ On the other hand, the minutes conceivably could evidence custom and practice in the paneling industry, and that, in turn, arguably could indicate in some degree the parties' intentions when they entered into the contracts in question.[30] Strictly speaking, the parol evidence rule does not bar extra-contractual evidence of meanings assigned the terms of an agreement;[31] that is the function of the plain meaning rule, which prohibits consideration of extrinsic evidence of intent when the contract is unequivocal.[32]

Speaking to the role of ambiguity in this connection, we have summarized the District of Columbia law in this manner:

Construction of unambiguous features of a written contract is a problem for the court, not the jury. Put another way, the legal effect of reasonably clear terms of a contract is a question of law for judges. The admissibility of extrinsic evidence, and possible need for the jury to assess it, depend upon the existence of an ambiguity in the contract. Only if its meaning is dubious, and the evidence of the parties' intention is uncertain or conflicting, is there appropriate occasion to seek the conclusion of jurors as to what was in mind. Moreover, the question whether the contract is ambiguous or not is one of law to be determined by the court.[33]

With these principles in mind, we turn to the franchise agreements in suit.

## IV. THE FRANCHISE AGREEMENTS

■ In the federal courts, a party moving for summary judgment bears the burden of establishing the absence of any issue of material fact.[34] This principle obtains although the movant would not have the burden of proof at trial.[35] Moreover, the

---

27. J.App. 104.

28. See note 6 *supra*.

29. See cases cited *supra* note 25.

30. The relevance of this possible custom is not vitiated by the fact that only one of the appellant-franchisees attended the management meeting. *Lee v. Flintkote Co., supra* note 1, at 5 & n. 5, J.App. 112. See, *e. g., 1901 Wyoming Ave. Coop. Assoc. v. Lee, supra* note 26, 345 A.2d at 461 ("[w]here the court is faced with an integrated agreement which contains ambiguous terms, the standard of interpretation is 'what a reasonable person in the position of the parties would have thought it meant,' " quoting *Minmar Builders, Inc. v. Beltway Excavators, Inc., supra* note 26, 246 A.2d at 786; "[t]he presumption is that the reasonable person knows all the circumstances before and contemporaneous with the making of the integration. The reasonable person is also bound by all usages—habitual and customary practices—which either party knows or has reason

to know." *Id.* at 461–462 (footnotes omitted)). See also D.C.Code, § 28:2–202(a) (1973).

31. See *1901 Wyoming Ave. Coop. Assoc. v. Lee, supra* note 26, 345 A.2d at 461–462; J. Calamari & J. Perillo, Contracts 98–131 (2d ed. 1977); L. Simpson, Contracts 204–208 (2d ed. 1965).

32. See note 26 *supra* and accompanying text.

33. *Clayman v. Goodman Properties, Inc., supra* note 25, 171 U.S.App.D.C. at 96, 518 F.2d at 1034 (1973) (footnotes omitted).

34. *E. g., Gray v. Greyhound Lines, East,* 178 U.S.App.D.C. 91, 96, 545 F.2d 169, 174 (1976); *United States v. General Motors Corp.,* 171 U.S.App.D.C. 27, 48–49, 518 F.2d 420, 441–442 (1975).

35. *United States v. General Motors Corp., supra* note 34, 171 U.S.App.D.C. at 48, 518 F.2d at 441; *Franklin Nat'l Bank v. L. B. Meadows & Co.,* 318 F.Supp. 1339, 1343 (E.D.N.Y.1970);

party opposing summary judgment need not present any evidentiary matter unless the movant has made a prima facie showing that the case is completely free from any significant question of fact.[36] The movant thus faces a formidable task,[37] but we think it was accomplished here.

We must, at the outset, agree with Flintkote that if Ply*Gem's promise not to approve a "licensed location" within two and a half miles of a franchise's store was intended as a grant of exclusive selling rights within that area, it was most awkwardly put.[38] We are skeptical, too, that so important a feature of the franchise agreement would be so infelizcitously phrased by those as astute as businessmen generally are.[39]

Our role on this appeal, however, is not to construe the franchise contract but to determine whether it so lucidly fails to confer an exclusive right to sell as to foreclose consideration of evidence beyond its four corners.[40]

■ By the law of the District of Columbia, a contract is ambiguous when it is "reasonably susceptible of different constructions or interpretations." [41] Indeed, essentially that standard for determining ambiguity appears to be in fairly general use by American courts.[42] The question at this point, then, is whether the franchise agreements in suit can reasonably be given more than one meaning with respect to

6 J. Moore, Federal Practice ¶ 56.15[3] (2d ed. 1948).

**36.** *United States v. General Motors Corp.*, supra note 34, 171 U.S.App.D.C. at 48, 518 F.2d at 441; *Bloomgarden v. Coyer*, 156 U.S.App. D.C. 109, 114–115, 479 F.2d 201, 206–207 (1973).

**37.** The restrictive view of the summary judgment device summarized in text has been criticized as contrary to the salutary function of the procedure: to determine early on if a party has enough evidence to justify the time and expense of a trial. See Currie, *Thoughts on Directed Verdicts and Summary Judgments*, 45 U.Chi.L.Rev. 72, 76–79 (1977); *cf.* Louis, *Federal Summary Judgment Doctrine: A Critical Analysis*, 83 Yale L.J. 745, 752–753 (1974). If, in response to a motion for summary judgment, the argument runs, the party having the burden of proof on an issue is unable to muster sufficient evidence to withstand a motion for a directed verdict, then summary judgment should be entered against him even though the movant has not made a strong showing.

We need not enter the debate, however, for whatever merit this critique may have, we are constrained by controlling precedent. See, e. g., *Adickes v. S. H. Kress Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142, 155 (1970). See also cases cited *supra* notes 34–36. Indeed, Fed.R.Civ.P. 56(c) expressly provides that the materials on file must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment . . . ." And as the Advisory Committee has explained:

Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.

Advisory Committee Note (1963) to Fed.R. Civ.P. 56(e), 31 F.R.D. 648 (1963). We recognize, then, that Flintkote had the burden of clearly establishing that the franchise agreements did not award exclusive selling rights to the franchisees of Ply*Gem outlets.

**38.** Brief for Appellee at 8–10.

**39.** Compare *Dahath Elec. Co. v. Suburban Elec. Dev. Co.*, 332 Pa. 129, 2 A.2d 765, 768 (1938):

[P]arties to this contract, competent businessmen, had they contemplated an exclusive agency would we think have so provided in their written agreement. It could not be properly or justly concluded that they left this most important feature of the agreement out to be read into it by inference.

As was said in *American Dressler Tunnel Kilns, Inc. v. Holt*, 269 Pa. 293, 297, 112 A. 43, 44, "Considering the entire contract, its meaning is not doubtful, and therefore we cannot consider the evidence, pro and con, as to the parties' own construction thereof. It is only in case of doubt or ambiguity that the parties' own construction can be resorted to." This is particularly true here, where the parties in their written agreement have stated that everything preceding it is superseded and cancelled by it and that the agreement as written is not to be varied in any manner except in writing.

**40.** See text *supra* at note 9.

**41.** *1901 Wyoming Ave. Coop. Assoc. v. Lee*, supra note 26, 345 A.2d at 461 n. 7.

**42.** *E. g.*, *Barham v. Barham*, 33 Cal.2d 416, 202 P.2d 289, 293 (1949); *Martindell v. Lake Shore Nat'l Bank*, 15 Ill.2d 272, 154 N.E.2d 683, 689 (1958); *Universal C. I. T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951); *Young v. Schriner*, 190 Va. 374, 57 S.E.2d 33, 35 (1950).

exclusivity or non-exclusivity of the franchisee's right to sell Ply*Gem products within his territory. We conclude that it cannot.

The franchise contracts confer upon the franchisee "the right to open and operate one retail store for the sale and distribution of building materials and allied products under the trade and service names and marks, including PLY*GEM PANELING CENTERS, owned by" Ply*Gem.[43] To this grant the contracts specifically tie the right to use the Ply*Gem name and marks,[44] as well as entitlement to designated fran-

chisor-supplied services.[45] The franchisees' retail stores are thus portrayed as specially endowed and supported outlets of the Ply*Gem line of products.[46]

Appellants point, however, to the one and only passage in the franchise agreements connoting any sort of exclusivity. That is a provision stating that "[o]nce a particular site or location" for a franchised store "has been approved, [Ply*Gem] shall not approve another licensed location within a radius of two and one-half (2½) miles of such location, without the consent of the" fran-

---

**43.** Paragraph 3 of the Franchise Agreement provides:

In consideration of the sum of Ten Thousand ($10,000) Dollars to be paid by OPERATOR, as hereinafter set forth, AREA DISTRIBUTORSHIP does hereby license OPERATOR and grant the right to open and operate one retail store for the sale and distribution of building materials and allied products under the trade and service names and marks, including PLY*GEMS PANELING CENTERS, owned by PLY*GEM INDUSTRIES, INC. and its subsidiaries. OPERATOR hereby accepts such license and franchise by paying the sum of Five Thousand ($5,000), in cash or certified check for such license at the time of the execution of this agreement. Each party shall have a period of one hundred twenty (120) days from the acceptance of this agreement by THE PANELING STUDIO, INC. within which either may locate a site for the operation of this outlet, which site shall be submitted for approval to the other party. Such approval or disapproval of any proposed location shall be given within seventy-two (72) hours after receipt of the notification of such selection. The balance of Five Thousand ($5,000) Dollars shall be payable in cash or certified check forthwith upon approval of the location. This period of time may be extended by mutual written agreement. In the event of disagreement over a selected site, the OPERATOR'S decision shall prevail. Once a particular site or location has been approved, AREA DISTRIBUTOR shall not approve another licensed location within a radius of two and one-half (2½) miles of such location, without the consent of OPERATOR.

**44.** Ply*Gem contracted

[t]o permit OPERATOR to use the trademarks, copyrights, trade names, service marks and logotypes belonging or licensed to THE PANELING STUDIO, INC. as authorized by the owner thereof from time to time, and specifically to display the "PLY*GEMS PANELING CENTERS" and "PLY*GEMS"

trade names and trademarks in all local advertising at OPERATOR'S place of business, and on all signs, literature, labels, uniforms and equipment, which OPERATOR may utilize in the course of his business operation. OPERATOR shall not, however, use the names of the AREA DISTRIBUTOR, "THE PANELING STUDIO, INC." or "PLY*GEMS" or any part thereof, as part of any corporate name.

Complaint, Ex. 1 at 2, ¶ 5(a).

**45.** Ply*Gem also covenanted

(b) to provide OPERATOR with training, information, techniques and guidance to enable him to open, operate and manage a PLY*GEMS PANELING CENTER, as outlined in the General Operating Policies.
(c) to provide OPERATOR with a source of supply, and make available to OPERATOR brand name and private label products and other merchandise generally sold in the regular course of business of his PLY*GEMS PANELING CENTER, at favorable average prices.
(d) to foster OPERATOR'S business through advertising, and public relations campaigns, and to provide the additional services outlined in the General Operating Policies.

Complaint, Ex. 1 at 3, ¶¶ 5(b)–(d). Letter agreements dated June 11, 1974, purportedly eliminated Ply*Gem's obligation to furnish marketing services specified in ¶¶ 5(b) and 5(d) in return for dissolution of the franchisees' duty to pay royalties pursuant to ¶ 6(c) of the franchise contracts. J.App. 22–25. Appellants contend that the letter agreements never became effective. J.App. 50–54, 62–71. Whatever the proper outcome of this dispute, the fact remains that ¶¶ 5(b) and 5(d) were integral parts of the franchise contracts when made.

**46.** The franchisees are required to maintain Ply*Gem products as their principal though not their sole product line. Complaint, Ex. 1 at 4, ¶¶ 6(b), (e).

chisee.[47] The argument is that the prohibition on "another license location" bars any and all sales of Ply*Gem products within the designated area by anyone other than the franchisee.

■ Whatever appeal this claim may superficially engender evaporates when the expression "another licensed location" is viewed in its contractual context. Within a single paragraph,[48] the franchise agreements do three things. First, they "license" the operation of a retail store,[49] and thrice denominate the franchise a "license."[50] Second, they erect a procedure by which the "location" of a franchised retail store is to be fixed, and make plain that the "location" spoken of is the physical situs of the store.[51] Third, the franchise contracts then impose the ban on "another license location" within the radius specified,[52] and we see nothing to which the interdiction could plausibly refer save an additional franchise retail outlet for the Ply*Gem line. Put slightly differently, the contractual language makes it well nigh obvious that what is forbidden is some other ("another") franchised ("licensed") site ("location") for a retail store—the only thing the Ply*Gem companies franchise—within the proscribed area.[53] As the District Court stated:

It is clear to this Court that the only exclusive right granted in the franchise agreement is the right of the franchisee to operate an exclusive Ply*Gem outlet within a two and one-half mile radius. There is *no* provision which even arguably gives the operator the right to be the exclusive seller of Ply*Gem products, either to contractors or to retail customers

in general, in that territory. Nothing in the contract would preclude Ply*Gem or its distributor from selling Ply*Gem products to other retailers in the territory, as long as those retailers did not operate Ply*Gem outlets. . . .

The conclusion set forth above extinguishes [appellants'] claim: If [appellants] had no exclusive selling rights under the contract[s], then there were no such rights with which Flintkote could have interfered.[54]

This interpretation hardly does violence to the franchise contracts taken as a whole. For a consideration of $10,000[55] and a promise to remit royalty payments of five percent of weekly gross receipts,[56] the franchisee acquired the right to operate a Ply*Gem paneling center, complete with trademarks and trade names, a guaranteed source of supply, and various forms of business support by the franchisor. Customers would be attracted to the paneling center rather than to other nearby stores that might also carry Ply*Gem products by the completeness of the center's inventory, assistance by trained sales personnel and the lure of the franchisor's advertising for the benefit of the franchisees. With these advantages inuring to the licensed Ply*Gem outlets, the franchise agreements, though lacking a provision conferring exclusive selling rights, could not seriously be viewed as empty business transactions.

We are mindful that our present call is not to construe the franchise agreements, but simply to determine whether the written language is amenable to more than one

47. Complaint, Ex. 1 at 2, ¶ 3, 8th sentence, quoted in note 43 *supra.*

48. Complaint, Ex. 1 at 1–2, ¶ 3, quoted in note 43 *supra.*

49. Complaint, Ex. 1 at 1, ¶ 3, 1st sentence, quoted in note 43 *supra.*

50. Complaint, Ex. 1 at 1, ¶ 3, 1st and 2d sentences, quoted in note 43 *supra.*

51. Complaint, Ex. 1 at 1–2, ¶ 3, 3d, 4th and 7th sentences, quoted in note 43 *supra.*

52. Complaint, Ex. 1 at 2, ¶ 3, 8th sentence, quoted in note 43 *supra.*

53. Compare *White Co. v. White Motor Co.*, 159 App.Div. 716, 144 N.Y.Supp. 960, 961 (1st Dep't 1913). *Cf. J. C. Millett Co. v. Distillers Distrib. Corp.*, 258 F.2d 139, 141 (9th Cir. 1958).

54. *Lee v. Flintkote Co., supra* note 1, at 3–4, J.App. 110–111. .

55. Complaint, Ex. 1 at 1–2, ¶ 3, quoted at note 43 *supra.*

56. Complaint, Ex. 1 at 3, ¶ 6(c).

reading. We realize, too, that the language might conceivably be strained to connote the grant of an exclusive agency to sell within the franchisee's territory. Neither of these considerations, however, alters our conclusion. We adhere to the accepted test for ambiguity [57] and, looking solely at the pertinent contractual language [58] and undertaking only to determine whether it is "reasonably susceptible of different constructions or interpretations," [59] hold that it does not.

Since the franchise agreements do not so much as ambiguously portend an exclusive right to sell Ply*Gem products, there is nothing that Flintkote's marketing operations could have treaded on. It follows that the District Court's ruling excluding extrinsic evidence and awarding summary judgment to Flintkote was eminently correct, and that judgment is accordingly

*Affirmed.*

---

**57.** See text *supra* at note 41.

**58.** We have previously declared that a party may not "reach outside . . . unambiguous contracts for an argument seeking to impart uncertainty, and then again utilize the ex-

trinsic material to resolve the so-called doubt." *Appalachian Power Co. v. FPC*, 174 U.S.App. D.C. 100, 106, 529 F.2d 342, 348 (1976).

**59.** See text *supra* at note 41.