**UNIVERSAL COMPUTERS (SYSTEMS) LTD., Nicholas A. Drescher, Christopher Holman and Alan B. Wilson, Plaintiffs and Defendants-in-Counterclaim,**

v.

**DATAMEDIA CORPORATION, Defendant and Plaintiff-in-Counterclaim,**

v.

**UNIVERSAL COMPUTERS (HOLDINGS), LTD., Universal Computers (Services), Ltd., and Universal Computers, Ltd., Additional Defendants-in-Counterclaim.**

**Civ. A. No. 84–2559.**

United States District Court, D. New Jersey.

Jan. 15, 1987.

Kelly, Drye & Warren by Jeffrey S. Cook, Robert S. O'Hare, Morristown, N.J., for plaintiffs and defendants-in-counterclaim and additional defendants-in-counterclaim.

Archer & Greiner, P.C. by Lisa Longmire, Haddonfield, N.J., and Testa, Hurwitz & Thibeault by Bernard J. Bonn, III, Ronald T. Gerwatowski, Boston, Mass., for defendant and plaintiff-in-counterclaim.

## OPINION

COHEN, Senior District Judge:

This breach of contract and fraud action is presently before the Court on several post-trial motions. Defendant, Datamedia Corporation ("Datamedia") moves for a new trial, or a judgment notwithstanding the verdict ("j.n.o.v.") or a remittitur. Plaintiffs, Universal Computers (Systems) Ltd. ("UCSL"), Nicholas A. Drescher, Christopher Holman and Alan B. Wilson move to amend the jury trial verdict to include prejudgment interest and attorneys' fees.

## BACKGROUND

UCSL is a corporation organized under the laws of the United Kingdom with its main offices located in London, England. It was established by its parent company, Universal Computers, Ltd. ("UCL")[1] to purchase and resell certain computer hardware and software.[2] The individual plaintiffs helped capitalize UCSL and had substantial responsibilities in its management.

---

1. UCL had years of experience selling various computer systems in the United Kingdom.

2. "Hardware" refers to the physical components of computers, the machines themselves, whereas "software" refers to the programs and systems used by the hardware.

Defendant, Datamedia, is a Delaware corporation with its principal place of business located in Pennsauken, New Jersey. It is in the business of designing, manufacturing and marketing various computer products, including hardware and software.

UCSL entered into a contract with Datamedia in April, 1983, wherein UCSL was given the right to act as the exclusive "Authorized Datamedia Dealer" for a territory made up of the United Kingdom, the Republic of Ireland, the Isle of Mann and the Channel Islands. Datamedia agreed to sell and UCSL agreed to buy a computer system manufactured by Datamedia, the 932 PICK system.[3] The contract (hereinafter referred to as "Dealer Agreement") required that UCSL make timely payment of all invoices, meet a specified quota for the number of systems purchased from Datamedia[4] and provide Datamedia with sublicense agreements[5] executed by the ultimate purchaser, or "end-user" of each system sold by UCSL. Further, as provided in Section 4 of the Agreement, the failure of UCSL to comply with these requirements gave Datamedia the right to terminate it.

Sometime in the latter half of 1983, while UCSL was preparing for the first quota period, Datamedia entered into negotiations with International Computers, Ltd. ("ICL"), another United Kingdom company, regarding a possible agreement for the sale to ICL of the Datamedia 932 PICK or a substantially similar system. ICL is the largest computer company in Western Europe, and was described by a witness in this case as "the IBM of Europe." It has an extensive, world-wide sales and dealer network and is much larger than either UCSL or Datamedia.

In December of 1983, eight months after the execution of its Dealer Agreement with UCSL and at the beginning of the first quota period, Datamedia and ICL executed a document called the "Heads of Agreement," which recorded the bases of a proposed contract between them. Their negotiations continued,[6] and culminated in an agreement signed on or about February 24, 1984 and termed a Volume Purchase, or Original Equipment Manufacturer ("OEM") Agreement. This agreement granted ICL the exclusive right to sell computer systems which included the Datamedia 932 family of computers, the very same family covered by the UCSL Dealer Agreement. ICL was granted world-wide mar-

---

3. "PICK" was the name given to the software used by the system. It was provided by Pick Computer Works, Inc. and was licensed to Datamedia. The system included both hardware and software.

4. Schedule 2 of the Dealer Agreement specifies the number of systems UCSL must purchase from Datamedia in each three month "quota period." These quota periods were to commence on December 1, 1983 and run consecutively for the term of the contract. In the first quota period, from December 1, 1983 to March 1, 1984, UCSL was to purchase 12 systems, then 25 in the second period, 37 in the third period, 51 in the fourth period, and 30 in each of the remaining quota periods.

 The contract was executed on April 22, 1983, and it provided that it would remain in effect for four years from that date, and that any time thereafter Datamedia could terminate upon one year's written notice. Section 1.3 of Dealer Agreement. The minimum contract term was thus five years, and from the above quotas UCSL was required to purchase approximately 515 systems in that time.

 Plaintiffs contend that the total number of systems covered by the five-year term is 605, but that figure does not take into consideration the

period from April 22, 1983 to December 1, 1983, when UCSL was not required to purchase *any* systems. April 22, 1988, the earliest possible termination date, falls in the middle of one of the quota periods, so we count the last quota period as December 1, 1987 through March 1, 1988, since the contract makes no provision for partial quota periods.

5. These agreements were to restrict the ways the purchasers could use the software because the software is a valuable proprietary product and trade secret.

6. By mid-January, 1984, UCSL had purchased eight systems from Datamedia. In the first quota period, from December 1, 1983 to March 1, 1984, UCSL was required by the Dealer Agreement to purchase twelve systems. Plaintiffs alleged that rumors of the negotiations between Datamedia and ICL severely impaired sales since potential customers may have questioned UCSL's ability to continue supplying the systems, and would have preferred to purchase from the very well known ICL than from the less-established UCSL.

keting rights, with "exclusive" marketing rights in certain areas, including the territory covered by the UCSL Dealer Agreement.

In March and April of 1984, a series of meetings was held by representatives of UCSL, ICL and Datamedia to see if an agreement could be reached whereby UCSL would become the exclusive United Kingdom dealer for the PICK Systems as packaged by ICL. On April 16, 1984, UCSL rejected the terms proposed by ICL. One could infer that Datamedia realized it might be faced with a lawsuit by UCSL and hoped an agreement between UCSL and ICL would obviate the necessity for any such action.

Then, on April 17, 1984, the day after UCSL rejected the proposed arrangement with ICL, Datamedia notified UCSL that their agreement was immediately terminated, claiming that UCSL was seriously behind in its payments to Datamedia and that it had failed to provide the required sub-license agreements. This left the larger and more prestigious ICL as the sole United Kingdom seller of the Datamedia PICK Systems.

Plaintiffs instituted the instant action on or about June 28, 1984, alleging that defendant breached the Dealer Agreement, breached a covenant of good faith and fair dealing, and acted fraudulently in connection with this Agreement. Defendant filed a counterclaim against the plaintiffs, and additional defendants in the counterclaim UCL, Universal Computers (Holdings), Ltd., and Universal Computers (Services),[7] for monies owed by UCSL for systems purchased from Datamedia.

The three week jury trial of this action commenced on September 8, 1986. On September 25, 1986, the case was given to the jurors for their deliberations. Because of the complexity of this case, they were instructed to respond to a form of Special Interrogatories prepared by the Court with the aid and consent of both counsel.

On September 26, 1986, the jury returned their responses to the Special Interrogatories, a copy of which is attached to this opinion as Exhibit A. In *Section A—Breach of Contract by Datamedia*, they indicated that Datamedia did materially breach the Dealer Agreement, that UCSL substantially performed its obligations under the Dealer Agreement, and that UCSL proved it suffered damages which were directly caused by Datamedia's breach. On the line marked "Amount," the jury wrote "Two Million Dollars." In *Section B—Breach of Duty of Good Faith and Fair Dealing by Datamedia*, the jury found that Datamedia did breach the duty of good faith and fair dealing, that UCSL substantially performed its obligations under the Dealer Agreement, and that UCSL proved that it suffered damages which were directly caused by this breach. However, the jury did not write anything in the space for the "Amount" of these damages. In *Section C—Fraudulent Misrepresentations as to UCSL*, the jury indicated that Datamedia did make a false statement to UCSL in connection with the Dealer Agreement, and that UCSL reasonably relied on that statement. However, even though the question specifically directed the jury to state the amount of damages from this misrepresentation, they again did not fill in an amount. Thus, the jury responses to the liability questions are consistently clear even if their responses to the damage questions are not. In *Sections D, E, and F—Fraudulent Misrepresentation as to Individual Plaintiffs*, the jury found that Datamedia had made a false statement but that none of the three plaintiffs reasonably relied on that statement to his personal injury. In *Section G—Punitive Damages*, the jury found that Datamedia's actions were done with actual malice or spite, or in wanton, willful and reckless disregard of the rights of plaintiffs. The jury filled in $10,000 as the single amount of punitive damages that would punish Datamedia for its conduct. In *Section H—Breach of Contract by UCSL for Failure to Pay*, the jury found that UCSL failed to make payments to Datame-

---

**7.** These companies are various affiliates of UCL.

dia for products it accepted, and that the amount of money UCSL owed as a result of this failure is $45,000. In *Section I—Liability of the Universal Companies,* the jury found that UCL and the other affiliated companies should be responsible for UCSL's debts. The judgment was entered on September 30, 1986.

### I. *Defendant's Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial*

Defendant moves for j.n.o.v. on three issues: the jury's verdict that plaintiff should prevail in the breach of contract claim; the award of damages for lost profits; and the award of punitive damages. We will address each of these issues in turn.

We begin by noting that an order granting a j.n.o.v. is governed by Fed.R.Civ.P. 50(b) and is an extraordinary remedy. It should be granted only when the evidence, exposed to the light most favorable to the non-moving party, supports only one conclusion, namely in favor of the movant. See *Hild v. Bruner,* 496 F.Supp. 93, 97 (D.N.J.1980). The standard for granting a motion for j.n.o.v. is the same as for a directed verdict. *Skill v. Martinez,* 91 F.R.D. 498, 503 (D.N.J.1981), *aff'd* 677 F.2d 368 (3d Cir.1982).

Motions for a new trial are governed by Fed.R.Civ.P. 59(a), and may be granted to prevent an injustice or to correct a verdict that is clearly against the weight of the evidence. *American Bearing Co., Inc. v. Litton Industries,* 729 F.2d 943, 948 (3d Cir.), *cert. denied,* 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984). A court must be careful not to usurp the jury's function and should not substitute its judgment for that of the jury. *See Borbely v. Nationwide Mutual Ins. Co.,* 547 F.Supp. 959, 980 (D.N.J.1981). Here, there was sufficient evidence to support the jury's verdict and we therefore deny defendant's motion.

### A. *UCSL's Breach of Contract Claim*

Plaintiffs allege that defendant breached several provisions of the Dealer Agreement, specifically, the provisions granting UCSL exclusive sales rights, prohibiting interference with a contractual relationship with another party, and governing the termination of the contract. The jury found that defendant materially breached the Dealer Agreement. However, in the Special Interrogatories, prepared, as heretofore indicated, with the aid and consent of both counsel, the jury was not requested to specify which part(s) of the contract were breached. In urging a j.n.o.v., or new trial on the breach of contract issue, defendant contends that it did not breach *any* of the three provisions.

### 1. *Submission of the Contract to the Jury for Interpretation*

■ Defendant's first argument, in support of its motion for j.n.o.v. or new trial on the breach of contract claim, is that the Court should have instructed the jury that the language of the contract was unambiguous and should have ruled, as a matter of law, as to the language's meaning.

One of defendant's positions, at trial, was that its contract with ICL was not a breach of the Dealer Agreement with UCSL because the Dealer Agreement only gave UCSL the right to be the exclusive *dealer* of the computers, and ICL was to be an Original Equipment Manufacturer and not a dealer. In addition, defendant maintained that the computers covered by the UCSL Dealer Agreement were not the same as those involved in the transaction with ICL. Thus, a critical issue was the exact scope of the Dealer Agreement. The relevant language contained therein is from Sections 1.1 and 1.3 of the agreement.

Under Section 1.1, UCSL received the rights "to sell and license the Electronic Data Processing Systems and Software Products listed in Schedule 1 ..., *as it may from time to time be amended pursuant to Paragraph 5 of this Agreement ...*" (emphasis added)[8] Section 1.3 of the

---

**8.** In fact, Schedule 1 was later revised to include newly developed systems utilizing the Pick software.

UCSL Agreement states that: "Notwithstanding any other provisions as set forth herein, the SELLER and DEALER acknowledge that *DEALER's rights* to serve as SELLER'S AUTHORIZED DATAMEDIA DEALER *are exclusive within DEALER's geographical territory as described in Schedule 2....*" (emphasis added)

Defendant submits that this language is susceptible of just one meaning, that only the appointment of another Authorized Dealer would violate the exclusivity provision, and that the jury should have been so instructed.[9] In support of its position, defendant cites the case of *Lee v. Flintkote Co.*, 593 F.2d 1275 (D.C.Cir.1979) in which the court interpreted a franchise agreement clause giving the franchisee the exclusive right to sell the franchisor's products in a certain territory. The relevant contract clause stated that the franchisor "shall not approve another licensed location within a radius of two and one-half (2½) miles" of an approved franchise location. *Id.* at 1283–84. The court there found that this language did not prevent *any* sales of the relevant products by any other entity, but only prohibited the establishment of another retail franchise store. *Id.* at 1284. The court there ruled that this clause was not reasonably susceptible to other interpretations. Defendant in the present case believes we should make a similar finding here.

The language in the UCSL Dealer Agreement is not as unambiguous as that in *Lee*. It is unclear what is meant by UCSL's right to be the "Exclusive"—"Authorized Datamedia Dealer," and what acts by defendant would violate that right. The contract in the present case is reasonably susceptible to more than one interpretation, and its language is not as specific as that in *Lee*, which spelled out what the fran-

chisor could do. We therefore hold that the plain meaning rule does not apply here, and the contract was properly submitted to the jury for its interpretation.

2. *Proof that Defendant Interfered with a Contractual Relationship Between UCSL and a Third Party*

■ Plaintiffs also claimed that defendant breached Section 18 of the Dealer Agreement, which states: "As a condition of this Agreement, neither the DEALER nor the SELLER shall interfere with any advantageous contractual relationship of the other." The parties seem to agree that this clause was designed to protect contracts each had with third parties, but defendant claims there was no evidence of any breach of this clause.

Plaintiffs contend that the jury was presented with sufficient evidence to support a finding that Section 18 was breached by the defendant. Plaintiffs point to the testimony of several witnesses that the rumors in the computer industry and trade press about the Datamedia—ICL deal caused a number of potential UCSL customers to withdraw from purchases. One of UCSL's salesmen testified that he left its employ because of these conditions, and plaintiffs maintain this interfered with an employment contract. We agree with plaintiffs that a reasonable jury could have found a breach of Section 18.

3. *Defendant's Right to Terminate the Contract on April 17, 1984*

Defendant's final argument in support of its motion for a j.n.o.v. or a new trial with respect to UCSL's breach of contract claim is that defendant was entitled to terminate the Agreement on April 17, 1984, when it sent UCSL the notice of termination. Defendant urges that it therefore did not have to comply with the termination provisions in the contract.

---

9. Defendant did request that the jury be so instructed, but the Court declined this request. In its pre-trial motion for summary judgment, defendant urged that its agreements with UCSL and ICL did not conflict, in part because the UCSL agreement was clear about the meaning of "Exclusive Dealer." We did not rule on that

argument because we found a genuine issue of material fact as to whether the systems covered by the two contracts were so similar as to make a conflict possible. *Universal Computers (Systems), Ltd., et al. v. Datamedia Corp.*, No. 84–2559, slip op. at 10–11 (D.N.J. December 14, 1984).

■ Defendant asserts two bases for its purported right to end the contract. First, it alleges that the jury's finding that plaintiffs are liable to defendant for $45,000 for failure to pay for goods means that plaintiffs materially breached the contract, and that defendant could cancel without notice. Plaintiffs respond by disputing the amount of money owed to defendant at the time in question, and claiming that this amount must be assessed as of a different date than that used by defendant.[10] Plaintiffs also claim that defendant's argument ignores the jury's express finding that UCSL substantially performed its contractual obligations. *See* Section A of the Special Interrogatories. Substantial performance occurs when a party acts in good faith and only makes slight deviations from its prescribed obligations, so that the other party gets substantially what it bargained for. *Amerada Hess Corp. v. Quinn*, 143 N.J. Super. 237, 362 A.2d 1258 (Law Div. 1976). Here, the jury's finding of substantial performance on the part of UCSL precludes our finding that UCSL was in material breach by owing $45,000 (see *supra* note 10) on a contract worth millions of dollars.

■ Defendant's second basis for claiming it had the right to terminate is that UCSL's Telex of April 17, 1984 constituted an anticipatory repudiation, so that defendant was justified in responding with *its* Telex terminating the contract. However, plaintiffs argue that there is nothing in UCSL's Telex to indicate that it would not or could not continue to perform its obligations, as would be necessary for an anticipatory repudiation. *See* Restatement (Second) of Contracts, § 250; *see also Robert L. Ferman & Co. v. Gen. Magnaplate Corp.*, 33 F.R.D. 326, 331 (D.N.J.1963), *Union Minerals and Alloys Corp. v. Port Realty & Warehousing Corp.*, 129 N.J.Super. 41, 45, 322 A.2d 192, 194 (Ch. Div. 1974). We agree with that assessment.

### B. *Plaintiffs' Alleged Failure to Prove Damages*

#### 1. *Proof of the Fact of Damages*

In arguing that plaintiffs have not met their burden of proving damages for lost profits, defendant alleges first that plaintiffs did not prove the *fact* of damages with the requisite degree of certainty. *See Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co.*, 607 F.Supp. 361, 367 (E.D.Pa.1985) (New Jersey Law). UCSL in order to recover damages must show with "reasonable certainty" that it suffered a loss of profits. *See id.* It is especially difficult for a new business to show a loss of future profits. *See* Restatement (Second) of Contracts § 352, comment b.

Defendant asserts that the jury was not presented with any evidence from which it could find with reasonable certainty that, but for defendant's alleged breach, plaintiffs would have earned profits. Defendant points out that, under the Dealer Agreement, it did not have to continue sup-

---

**10.** In the opinion on defendant's motion for summary judgment, *Universal Computers (System), Ltd., et al. v. Datamedia Corp.,* No. 84–2559, slip op. at 7 (D.N.J., December 14, 1984), we analyzed the payment terms of the contract. The Agreement provided that payment was due 30 days after delivery, that UCSL had another 60 days to pay before it was subject to termination, and that termination can only occur after UCSL is given 10 days additional notice in which to cure the breach.

Defendant contended that the date as of which UCSL's outstanding debts should be examined to assess whether UCSL materially breached the Agreement was April 17, 1984, the date of termination, and that on that date, the invoices outstanding more than 90 days totaled $45,174.14. We rejected this position and agreed with plaintiffs that the appropriate date for analysis was February 24, 1984, the date of the Datamedia-ICL contract, at which time invoices outstanding more than 90 days totaled $6,825.35. Of this amount, $5,854.70 was for replacement invoices for which Datamedia would issue credit to UCSL. We held that it was for the jury to determine whether this debt constituted a material breach of the Dealer Agreement.

The jury's determination that plaintiffs owed $45,000 [Section H of Special Interrogatories] to defendant does not conflict with our holding in the motion opinion, since the jury's assessment of a $45,000 debt was not for purposes of deciding whether UCSL was in material breach. The jury specifically found that UCSL was in substantial compliance with its obligations. See Section A of Special Interrogatories.

plying inventory if UCSL failed to meet its quota requirements, and defendant challenges UCSL's ability to meet those quotas. If UCSL could not meet the quotas, defendant could terminate the contract and there would obviously be no profits.

■ The evidence about UCSL's ability to meet its quotas was presented primarily through the testimony of Mr. David G. Green, plaintiffs' expert. Mr. Green has worked for various computer companies in the United Kingdom and has experience in sales forecasting in the computer field. He testified that under "normal conditions" UCSL "could have" met its quota obligations. Defendant asserts that since Mr. Green did not use the words "would have," there was no evidence from which the jury could find with reasonable certainty that UCSL would have met its obligations and earned a profit. This is merely an exercise in semantics. Defendant also claims that Mr. Green was not adequately familiar with UCSL's financial status to give an opinion about UCSL's ability to meet the quotas. Defendant raised this issue in its cross-examination of Mr. Green, so the jury heard these criticisms. In addition, defendant's expert, Mr. Thomas Bachman, testified that based on his review of UCSL's financial records it did not have the ability to pay Datamedia. Plaintiffs argued that the source of the financial problems was rumors about the Datamedia-ICL agreement, and the jury apparently accepted this argument in assessing Mr. Green's testimony with regard to UCSL's ability to perform under "normal circumstances." We also note that the testimony of Mr. Green was quite technical and difficult, so that even if the jurors did not follow every step in his analysis of the computer market, they apparently found him credible and accepted his conclusions about UCSL's ability to meet its quotas and receive the full benefit of the contract.

■ Defendant further attempts to disprove the fact of plaintiffs' lost profits by arguing that plaintiffs failed to show that there were any profits to be earned. The Court instructed the jury that market conditions could provide a basis for a finding that plaintiffs would have made a profit.[11] The jury was told that "in order for such evidence of lost profits to aid the plaintiff in proving its lost profit damages, ... the plaintiff must show with a reasonable degree of specificity how its product and its business practices fit into the general market opportunity, and, of course, the plaintiff must prove that it would have taken advantage of that particular market opportunity."

Here again, Mr. Green's testimony was sufficient evidence to support the jury's finding. He testified about the relevant market for small computer systems and the four sales channels plaintiffs were using to capitalize on that market. There was also evidence about the experience and success in the computer field of UCL, the parent of UCSL, and how UCL's existing contacts and knowledge would be utilized by UCSL. The "Pick Report"[12] was also introduced as evidence about the relevant market. It showed sales figures for companies selling products similar to those that were the subject of the contract in this case. Plaintiffs argued that these figures showed the viability of the market. Defendant responded that because none of the listed companies sold as many computers in one year as the quota amount in the Dealer Agreement, the figures show that plaintiff would not have made a profit. The import of these figures is a proper subject for jury interpretation.

In addition, none of the parties herein were "babes in the woods." Datamedia now argues that UCSL could not have met the quotas, yet those quotas were agreed upon by Datamedia and UCSL. The jury had the opportunity to observe the manner

---

11. This instruction was proposed by plaintiffs in their request to charge, and was not formally objected to by defendant.

12. This report analyzed the sales of computer systems using PICK Software in the United Kingdom for the years 1979 through 1985. It was prepared in 1986 by Digitus, Limited.

and demeanor of the various businessmen who participated in this negotiation. It may be assumed that, when Datamedia entered into the Dealer Agreement, it knew all about the plaintiffs and their parent organization. If UCSL would not have been able to meet its quotas, why did defendant agree to them? The jury certainly could have considered these issues in deciding that plaintiffs would have made a profit.

■ A final objection now raised by defendant on the issue of the fact of damages is that the jury was not presented with any specific data about the potential market for the years 1986, 1987 and 1988, the last three years of the contract term. Defendant argues that without such evidence the jury could not have found lost profits for those years. In addressing this objection, we are cognizant of our duty to uphold the jury's verdict if at all possible. The jury was presented with various evidence regarding the strength of the relevant micro computer market, and with Mr. Green's testimony that plaintiff would have met its quotas under the contract. The jury could have concluded from this evidence that plaintiffs would have earned profits in the last three years of the contract. Forecasting is hardly an exact science.

### 2. Evidence as to Amount of Damages

In support of its motion, defendant also asserts that plaintiffs failed to show the *amount* of damages with the necessary degree of specificity and certainty. We note that once the fact of damages has been established "the actual amount of lost profits may be estimated from the facts in evidence, including the inferences to be drawn from them and the probabilities they suggest." *Garden v. The Calvert,* 253 F.2d 395, 399–400. (3d Cir.), *cert. denied,* 356 U.S. 960, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958).

Alan Wilson, UCSL's commercial director, testified at trial as to his estimate of the amount of damages for lost profits. Here again, we note that the jury was presented with very technical and confus-

ing testimony, which here included a series of mathematical calculations. Defendant alleges various flaws in Mr. Wilson's testimony and calls that testimony speculative. Defendant's Brief at 31. An expert opinion on damages, urges the defendant, cannot satisfy the plaintiffs' burden "unless that opinion is based on relevant data and the assumptions behind the opinion are shown to be realistic so that the jury has a rational basis for its decision." *Bonjorno v. Kaiser Aluminum & Chem. Corp.,* 559 F.Supp. 922, 930 (E.D.Pa.1983), *rev'd in part on other grounds,* 752 F.2d 802 (3d Cir.1984), *cert. denied,* — U.S. ——, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986). We find that the jury was presented with sufficient evidence to reasonably calculate the amount of damages.

■ The first flaw in Mr. Wilson's testimony alleged by defendant is a failure to properly itemize expenses. It is true that Mr. Wilson did not explain in his testimony the individual expense items he aggregated to calculate his estimate of monthly expenses at £15,000 (approximately $22,500 based on the conversion rate Mr. Wilson used at trial) for all costs except buying inventory. However, this figure was taken from the UCSL 1983 Business Plan, which was entered into evidence, and that Plan contains a detailed breakdown of expenses. While Mr. Wilson did not explain the derivation of the "running costs" figure in his direct testimony, he was also not challenged about it on cross-examination. He was presented to the jury as someone familiar with the financial statements and operations of UCSL, and it was not necessary for the jury to hear the origin of every estimate he made. Taken to its logical extreme, defendant's argument would require not only a listing of each of the major categories of expenses, but also an explanation of how each of *those* items were calculated, and this process could continue *ad infinitum.* At some point the jury may accept the expert's conclusions, especially after the vigorous cross-examination to which Mr. Wilson was subjected.

■ A second alleged flaw in the testimony is that Mr. Wilson merely multiplied his projected annual operating expenses by five, the number of years of the contract term, without considering possible fluctuations in costs. Defendant points out that failure to consider projected inflation in making such calculations has been found to be reversible error. The case cited by defendant is *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132 (3d Cir.1973). In that case plaintiff sought to include a 6% inflation factor in its requested damages, but there was no evidence to support the use of that figure. The court held that, in the absence of such evidence, an award including future cost increases would be speculative. *Id.* at 144. In the present case, plaintiffs did not seek such an award based on increases as the years went on, but defendant charges that plaintiffs had a duty to show how inflation would impact on costs. Here, Mr. Wilson calculated expenses based on a monthly average of £15,000, even though the company's actual expenses in 1983 were closer to £5,000 per month. The testimony made clear that Mr. Wilson was using this more conservative figure, and the jury could have attributed that calculation to a need to consider inflation. We do not find the failure to present expert testimony on the future rate of inflation to have been necessary.

■ The final alleged flaw in Mr. Wilson's calculations is that he did not allow for a decline in the selling price of the computers over the five years of the contract. Plaintiffs respond by noting that the sole basis for defendant's assertion that prices would decline is the Pick Report, and that the testimony of Mr. Wilson showed that this report encompassed a much wider market than the computers to be sold by UCSL. Mr. Wilson was questioned on cross-examination about his failure to account for declining prices, and he responded that, even if competition increased, the price would not be driven down because UCSL was selling in a "market niche." In addition, plaintiffs note that the sales price used to calculate lost profits was the price of the lowest priced UCSL system. Plaintiffs contend that using this lowest price to calculate the profits for all systems over the five years would compensate for any possible decline in price. Again, the jury was made aware of this step in the calculations, and it could have concluded either that there was no evidence that prices would decline, or that any such decline was factored into the calculations of lost profits. Once more, forecasting is not an exact science. Absolute certainty is not required; the test is *reasonable* certainty.

■ Defendant also argues, in support of its challenge to the calculation of lost profits, that plaintiffs did not properly consider the profits earned from a contract with the Altos Company, allegedly entered into as a result of the termination of the contract with defendant. Under New Jersey law, "if a defendant's breach of contract frees the plaintiff to profitably utilize its facilities in some other way, the amount of compensating advantage thus derived must be subtracted from the profit which the plaintiff lost because of the breach." *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715, 720 (3d Cir.1971). The burden is on plaintiff to show that there was no such profit. *Id.*

Plaintiffs respond to the allegation that they profited from the breach by claiming that it was not UCSL that was a party to the Altos contract, but its parent company, UCL. The jury did find, in Section I of the Special Verdict Questions, that other Universal companies should answer for UCSL's debts. Here, however, UCSL completely ceased operations after the Dealer Agreement was terminated, and so it had no "facilities" to use to generate profits. Therefore, just because the other companies should answer for UCSL's debts does *not* mean that profits earned by UCL in the sale of Altos computers should be attributed to UCSL for the calculation of damages.

### 3. *Present Value Instruction*

■ Defendant's final argument with regard to the amount of damages for lost

profits is that plaintiffs "failed to present any evidence to provide the jury with a method of calculating the present value of any future lost profits." Defendant's Brief at 36. The Court instructed the jury that any award for future lost profits "is similar to a payment in advance, and in fixing this sum, that amount should be reduced to its present value. The present value is merely a single sum of money ... which would be sufficient at the specified rate of interest to provide a certain amount of money in the future." The Court further instructed that the interest rate to be used is one determined by the jury "as shown by the evidence and it should be a rate at which money can be safely invested."[13] Defendant claims the jury had no evidence from which to make this calculation and was left to guess about the appropriate interest rate.

Defendant further claims that the burden was on plaintiff to present evidence of how to calculate present value. *See DiSabatino v. National R.R. Passenger Corp.*, 724 F.2d 394, 395 (3d Cir.1984) (burden is on plaintiff to produce evidence of present value in Federal Employers' Liability Act case). In *Russell v. City of Wildwood*, 428 F.2d 1176 (3d Cir.1970), the court ordered a new trial on the issue of damages where the jury received an instruction to reduce the award to its present value, but no evidence as to interest rates was introduced. The court ruled that in the absence of any evidence as to how to compute present value the jury's verdict was based upon "sheer conjecture." *Id.* at 1183.

However, in *Russell* the defendant objected at trial to the relevant portion of the charge, claiming that this charge did not have an adequate relationship to the proofs presented. *Id.* at 1180. In the present case defendant made no objection before the jury retired. Fed.R.Civ.P. 51[14] precludes the defendant from objecting to this instruction for the first time on a motion for j.n.o.v. or new trial. Defendant claims that its objection does not go to the jury instruction but to a failure by plaintiffs to meet their burden. We do not accept this formalistic characterization of defendant's position. The essence of defendant's argument is that the instruction as to present value was erroneous because the jury did not have proper evidence to carry out the instruction. Defendant cannot make that objection for the first time in this motion.

### C. *Punitive Damages*

 Defendant claims that punitive damages were not legally available in this case. It cites authority for the proposition that punitive damages are not available when a cause of action is limited to breach of contract, regardless of the nature of the conduct constituting the breach. *See Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co.*, 607 F.Supp. 361, 374 (E.D.Pa.1985) (New Jersey law). However, the present case also involved a tort claim for fraud, and thus the jury could legally award punitive damages. *See Grow Farms Corp. v. Nat'l. State Bank*, 167 N.J.Super. 102, 400 A.2d 535 (Law Div. 1979). Defendant attempts to use the fact

---

**13.** This instruction was prepared and requested by the defendant. It included the following example: "[I]f a plaintiff were entitled to $100 in future profits over the next year, and if we assume an interest rate, just to use round numbers, of 10 percent per year, then you must not award that plaintiff $100 today, but rather you should award that plaintiff approximately $90 [sic-should be "91"] a day [sic-should be "today"], that way if the plaintiff invested the $91 at the 10 percent rate of return, then the plaintiff would have his $100 at the end of the year." [errors in transcript]

**14.** This rule reads as follows: Instructions to Jury: Objection

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.

that the jury did not fill in the damages amount on the Special Verdict Questions about fraud to show that the jury did not find fraud, since one of the elements of fraud is damages. We find that the jury interpreted the Special Verdict Questions to mean that one damage amount was to be filled in for the various breach of contract and fraud counts, and the jury's other responses marked on the Interrogatories indicate they did find fraud. The punitive damages award will therefore be upheld.

Plaintiffs also claim that even in contract cases punitive damages are available for egregious conduct, but we need not decide whether such egregious conduct was present here because the jury also found a cause of action in tort, and could thus award punitive damages based on that finding of tortious conduct.

### II. *Remittitur*

■ Finally, defendant seeks a remittitur of the damages award, claiming the verdict is excessive. An order of remittitur is within the discretion of the trial court. *Kazan v. Wolinski,* 721 F.2d 911, 913–14 (3d Cir.1983). For the reasons stated above we believe the jury had sufficient basis on which to find the fact of damages and to arrive at its award of damages, and we therefore deny the request for remittitur.

### III. *Plaintiff UCSL's Motion for Prejudgment Interest*

UCSL moves to amend the judgment to provide for prejudgment interest. In a diversity action, such as the instant case, whether to award prejudgment interest is a question of state law. *W.A. Wright v. KDI Sylvan Pools, Inc.,* 746 F.2d 215, 219 (3d Cir.1984).

Rule 4:42–11(b) of the Civil Practice Rules for the Courts of New Jersey provides, in pertinent part, as follows:

(b) Tort Actions. Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law, the court shall, in tort actions, including products liability actions, include in the judgment simple interest at 12% per annum on the amount of the award from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest. The contingent fee of an attorney shall not be computed on the interest so included in the judgment.

Thus, under this Rule prejudgment interest is available in tort cases as a matter of right. In addition, New Jersey courts have held that prejudgment interest may be awarded in contract cases, in accordance with equitable principles. *See Ellmex Construction Co. v. Republic Ins. Co.,* 202 N.J.Super. 195, 212–13, 494 A.2d 339, 348 (App.Div.1985); *Bak-A-Lum Corp. v. Alcoa Building Products,* 69 N.J. 123, 131, 351 A.2d 349, 353 (1976); *see also W.A. Wright, Inc., supra* at 219.

Plaintiffs urge that since the jury found defendant liable for fraud and for punitive damages, this is in part a tort case where prejudgment interest must be granted. Plaintiffs further argue that, to the extent this is a contract case, the equities favor an award of prejudgment interest.

■ Defendant responds with two arguments. First, it asserts that an award of prejudgment interest would not be equitable here, since its alleged misconduct was not as egregious as that in the contract cases cited by plaintiff which awarded the interest. *See W.A. Wright, Inc., supra,* and *Bak-A-Lum Corp., supra.* The equitable purpose of prejudgment interest is to compensate a plaintiff for the loss of what the monies he would have received would presumably have earned in interest. *Ellmex,* 202 N.J.Super. at 212, 494 A.2d at 348. While we must make an independent appraisal of whether an award of prejudgment interest would be equitable, *see W.A. Wright, Inc., supra* at 219, we will give credence to the jury's findings if possible. The jury found that had the contract not been terminated, plaintiffs would have earned substantial profits, and that

defendant acted fraudulently and in bad faith. Based on these findings and our own assessment of the case, we hold that an award of prejudgment interest is equitable here to fully compensate plaintiffs for their loss.

▆▆▆▆ Defendant's second and more persuasive argument, in opposition to the motion for prejudgment interest, stems from the fact that the jury's damages award was for losses spanning the entire five-year term of the contract—from 1983 through 1988. The jury awarded plaintiff a total of $2,000,000 for lost profits after presumably reducing the damages to present value as of the date of trial, as per the Court's instructions. Defendant correctly claims that some unidentified portion of this award is, of course, meant to compensate for losses accruing *after* trial, during the rest of 1986, and during 1987 and 1988.

Defendant asserts that prejudgment interest is properly awarded for *past* losses so as to fully compensate the plaintiffs, since plaintiffs did not have the use of the money lost during the time between the injury and the judgment. *See Ellmex Construction Co., supra.* Damages for profits plaintiffs would have earned in the years *after* judgment are not an appropriate subject for prejudgment interest, since plaintiffs would not have been deprived of the use of these funds prior to judgment. Therefore, defendant maintains, an award of prejudgment interest on such future lost profits would be punitive rather than compensatory, *see Columbia Brick Works, Inc. v. Royal Ins. Co.,* 768 F.2d 1066, 1068 (9th Cir.1985), and under New Jersey law prejudgment interest should only be compensatory, *see Busik v. Levine,* 63 N.J. 351, 358, 307 A.2d 571, 575, *appeal dismissed,* 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973).

Because the jury did not distinguish between pre- and post-judgment damages here,[15] defendant claims prejudgment interest for past losses cannot be calculated because the amount of prejudgment losses is itself not ascertainable, and thus *no* prejudgment interest may be awarded. We agree with this contention.

Plaintiffs, in their reply brief, dispute defendant's statement of the law on prejudgment interest regarding future lost profits. Plaintiffs claim that the distinction between past and future lost profits has been used only in wrongful death and personal injury cases in New Jersey, and not in contract disputes. *See, e.g., Friedman v. C & S Car Service,* 211 N.J.Super. 657, 674, 512 A.2d 560, 570 (App.Div.1986). The policy considerations in personal injury cases are not present in breach of contract cases, plaintiffs assert; however, plaintiffs do not explain this position, and we are not persuaded thereby.

If the court does find it necessary to distinguish between pre- and post-judgment losses, plaintiffs claim, then it should calculate what portion of the jury award was to compensate for prejudgment losses. Plaintiffs would have us make this calculation based on the percentage of *contract time* that would have elapsed at the time of judgment. This proposed calculation does not, however, reflect the fact that profits would probably not be equally distributed over a five-year period of selling a new product.

Another possible way to estimate what portion of the damage award was for prejudgment losses would be to utilize the quota periods. The quotas regulated the timing of the orders and the total number of systems to be ordered over the contract term, and could be used to calculate what percentage of the total number would have been ordered at the time of judgment.

---

**15.** In some cases, the jury is instructed to separate pre- and post-judgment losses, *see, e.g., Taliercio v. Compania Empressa Lineas Argentina,* 761 F.2d 126, 129 (2d Cir.1985). Other courts instruct the jury to reduce the award to its present value as of the date of *injury,* which assumes the plaintiff would have earned interest prior to judgment. *See, e.g., Friedman v. C & S Car Service,* 211 N.J. Super. 657, 674, 512 A.2d 560, 570 (App.Div.1986). Here, the jury made the present value calculation as of the date of *trial,* as it was instructed, and plaintiff did not request an instruction that the jury separate pre- and post-judgment losses.

However, the inquiry for purposes of pre-judgment interest on damages for lost profits is what percentage of the total *profit* would have accrued at the time of judgment, not what percentage of the inventory would have been ordered. There may have been variations in the selling prices and costs which would affect the relationship between the quotas and profits.

At this point there is simply not enough evidence from which we can accurately calculate the proper basis for imposing prejudgment interest and therefore we do not award any. *See Moorehead v. Mitsubishi Aircraft International, Inc.,* 639 F.Supp. 385, 405 (E.D.Tex.1986), stating that where "no attempt was made to distinguish between past and future losses ... no prejudgment calculation is possible." *See also Hillier v. Southern Towing Co.,* 740 F.2d 583, 586 (7th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 961, 83 L.Ed.2d 966 (1985); *Petition of the City of New York,* 332 F.2d 1006, 1008 (2d Cir.1964), *cert. denied,* 379 U.S. 922, 85 S.Ct. 277, 13 L.Ed.2d 335 (1964) ("To the extent that there are elements of future losses which are represented in the final damages prejudgment interest is, of course, not appropriate."). We therefore deny the motion to amend the judgment to include prejudgment interest.

### IV. *Plaintiffs' Motion for Attorneys' Fees*

Plaintiffs claim that they are entitled to attorneys' fees because defendant acted in bad faith prior to and during this litigation, particularly in regard to the discovery process. U.S. Magistrate Simandle, by an order and opinion of January 6, 1987, entered sanctions against defendant in the amount of $2,925.00, pursuant to Fed.R.Civ.P. 37(a)(4). We do not deem any additional sanctions to be appropriate.

An order will be entered reflecting our decisions in this case, as outlined above.

EXHIBIT A

### SPECIAL VERDICT QUESTIONS

#### SECTION A -- BREACH OF CONTRACT BY DATAMEDIA

(1) Did Datamedia materially breach the Dealer Agreement?

Yes No

If the answer is <u>no</u>, STOP and go to Section B; if <u>yes</u>, go to Question 2.

(2) Did UCSL substantially perform its obligations under the Dealer Agreement?

Yes No

If the answer is <u>yes</u>, STOP and go to Question 4; if <u>no</u>, go on to Question 3.

(3) Was UCSL's failure to substantially perform its obligations directly caused by Datamedia's breach?

Yes No

If the answer is <u>yes</u>, go to Question 4; if <u>no</u>, STOP and go to Section B.

(4) Did UCSL prove that it suffered any damages which were directly caused by Datamedia's breach, and if so, what is the amount of damages?

Yes No

Two Million Doila

Amount

## SECTION B -- BREACH OF DUTY OF GOOD FAITH

## AND FAIR DEALING BY DATAMEDIA

(1) Did Datamedia breach its duty of good faith
and fair dealing?

 Yes No

If the answer is yes, you must go to Question 2; if the answer is
no, STOP and go to Section C.

(2) Did UCSL substantially perform its
obligations under the Dealer Agreement?

 Yes No

 (Must be the same answer as given under Section A, Question
 2.) If no, go to Question 3; if yes, go to Question 4.

(3) Was UCSL's failure to substantially perform
its obligations directly caused by Datamedia's
breach of duty of good faith and fair
dealing?

 Yes No

If yes, go to Question 4; if no, STOP
and go to Section C.

(4) Did UCSL prove that it suffered any
damages which were directly caused
by Datamedia's breach of the duty of
good faith and fair dealing, and if so
what is the amount of damages?

 Yes No

 Amount

## SECTION C -- FRAUDULENT MISREPRESENTATIONS AS TO UCSL

(1) Did Datamedia make any false statement
to UCSL in connection with the Dealer
Agreement?

 Yes No

If yes, go to Question 2; if no, STOP and go to Section D.

(2) Did UCSL reasonably rely on that false
statement to UCSL in connection with
the Dealer Agreement?

 Yes No

 If yes, go to Question 3; if no, STOP and go to
Section D.

(3) If so, what are UCSL's damages?

 (fill in amount)

**SECTION D, E and F -- FRAUDULENT MISREPRESENTATION**

**AS TO INDIVIDUAL PLAINTIFFS**

**SECTION D**

DRESCHER

(1) Did Datamedia directly make any false statement
to Drescher in connection with the Dealer
Agreement?

 Yes No

If <u>yes</u>, go to Question 2; if <u>no</u>, STOP and go to Section E.

(2) Did Drescher reasonably rely on that
false statement to his personal injury?

 Yes No

If <u>yes</u>, go to Question 3; if <u>no</u>, STOP and go to Section E.

(3) Did Drescher suffer any personal
damages other than damages as a
result of his position as an
investor in Universal Computers
Limited?

 Yes No

If <u>yes</u>, go to Question 4; if <u>no</u>, STOP and go to Section E.

(4) What are those damages? _____
 (fill in amount)

**SECTION E**

BOLMAN

(1) Did Datamedia directly make any false
statement to Bolman in connection with
the Dealer Agreement?

 Yes No

If <u>yes</u>, go to Question 2; if <u>no</u>, STOP and go to Section F.

(2) Did Bolman reasonably rely on that
false statement to his personal injury?

 Yes No

If <u>yes</u>, go to Question 3; if <u>no</u>, STOP and go to Section F.

(3) Did Bolman suffer any personal
damages other than damages as a
result of his position as an
investor in UCSL?

 Yes No

If <u>yes</u>, go to Question 4; if <u>no</u>, STOP and go to Section F.

(4) What are those damages?
 
 (fill in amount)

**SECTION F**

## WILSON

(1) Did Datamedia directly make any false statement to Wilson in connection with the Dealer Agreement?

 ✓ ____
 Yes No

If <u>yes</u>, go to Question 2; if <u>no</u>, STOP and go to Section G.

(2) Did Wilson reasonably rely on that false statement to his personal injury?

 ____ ✓
 Yes No

If <u>yes</u>, go to Question 3; if <u>no</u>, STOP and go to Section G.

(3) Did Wilson suffer any personal damages other than damages as a result of his position as an investor in UCSL?

 ____ ✓
 Yes No

If <u>yes</u>, go to Question 4; if <u>no</u>, STOP and go to Section G.

(4) What was the amount of those damages?

 _____
 (fill in amount)

### SECTION G -- PUNITIVE DAMAGES

<u>INSTRUCTIONS</u>: To be answered only if you find Datamedia liable for fraud or breach of contract.

(1) Did plaintiffs prove that Datamedia's actions were done with actual malice or spite, or in wanton, willful and reckless disregard of the rights of plaintiffs?

 ✓ ____
 Yes No

If <u>yes</u>, go to Question 2; if <u>no</u>, STOP and go to Section H.

(2) What single amount of punitive damages do you feel punishes Datamedia for its conduct? (Only one award for Datamedia's conduct is allowed; you may not award multiple amounts for each of the plaintiffs.)

 10,000
 (fill in amount)

Go to Section H.

## SECTION H -- BREACH OF CONTRACT BY UCSL

### FOR FAILURE TO PAY

(1) Did UCSL fail to make payments to
 Datamedia for products it accepted?

 ✓
 —————— ——————
 Yes No

If yes, go to Question 2; if no, STOP and return verdict form to
the Court.

(2) What amount of money did Datamedia prove
 that UCSL owes as a result of the failure $45,000
 to pay for goods sold? ————————————
 (fill in amount)

Go to Section I.

## SECTION I -- LIABILITY OF THE UNIVERSAL COMPANIES

(1) Should the other Universal Companies be
 responsible for any of UCSL's debts?

 ✓
 —————— ——————
 Yes No

After you have completed this verdict form, please return it to
the Court.

_s/ Glenn Bateman_
————————————————————————
 Foreperson